Martin A. ARMSTRONG, Petitioner,

v.

Joseph R. GUCCIONE, U.S. Marshal for the Southern District of New York and Marvin D. Morrison, Warden, Metropolitan Correctional Center, Respondents.

No. 04 Civ. 6943(RO).

United States District Court, S.D. New York.

Dec. 23, 2004.

Chadbourne & Parke, LLP, Thomas V. Sjoblom, David Cooper, Benjamin R. Ogletree, for Petitioner.

U.S. Attorneys' Office, Brian Coad, Steven R. Glaser, for Respondents.

O'Melveny & Myers, LLP, Martin Glenn, Tancred V. Schiavoni, III, Cori Browne, for Receiver.

Stephen Jay Obie, for Commodity Futures Trading Commission.

## OPINION & ORDER

OWEN, District Judge.

Martin Armstrong, the petitioner in this habeas corpus, from his multitude of petitions and appeals is hardly unknown to the Southern District Court[1] and the Court of Appeals for the Second Circuit since September 13, 1999, so that only a focused statement of background is needed to put the issues here in perspective. The principal issue here flows from the fact that sometime prior to proceedings being commenced by the SEC and the CFTC and Armstrong's indictment by a Southern District grand jury on the aforesaid September 13, 1999, Armstrong transferred some $16 million corporate monies from the "Princeton" corporations' bank and brokerage accounts to more than twenty dealers to purchase gold bullions, valuable antique coins, and antiquities.[2] The receiver concluded that Armstrong had taken personal possession of the gold, coins, and antiquities, and that he was holding them as a corporate custodian (Armstrong being the Chairman of the Board, a director, an officer, and an employee of the Princeton entities). The receiver, Alan Cohen, appointed that September 13 by Judge Kaplan of this Court, was empowered to order Armstrong and the corporate defendants to turn over to him all books, records, and assets of the Princeton entities which they then had in their current possession and control. The turnover order is beyond any attack on this habeas.

---

1. The civil case is 99 Civ. 4669; the criminal case is 99 Cr. 00997 and in the Second Circuit there are somewhere in the double digits of appeals and applications all stemming from the sequel to his ownership and CEO-ship of the many related Princeton corporations which had at their core the business of receiving monies for investment from Japanese corporations and executives which, through allegedly abysmal management eventually turned into a criminal Ponzi scheme. Neither the civil case nor the criminal case have yet been tried (although 5 years have passed) as will be observed hereafter.

2. The principal one being a valuable historic bust of Julius Caesar.

*Maggio v. Zeitz,* 333 U.S. 56, 69, 68 S.Ct. 401, 92 L.Ed. 476 (1948).

■ In a letter of November 10, 1999, Armstrong's then counsel told the receiver that the petitioner would not return any corporate assets in his possession as this would violate his Fifth Amendment rights. Armstrong was thereafter, as a corporate custodian, served with a subpoena duces tecum seeking production of said corporate assets, records, and computers, among other items.[3] Armstrong did not produce any assets and the receiver moved for an order holding him in contempt. At a January 7, 2000 Court hearing, the receiver submitted extensive evidence establishing Armstrong's purchase of the bullion, coins and antiquities and that they were delivered to him. Armstrong did·not present any witnesses or evidence. His lawyers instead argued a turnover would violate his Fifth Amendment privilege. This was denied and Armstrong was directed to comply. Over the next week he turned over $1.1 million of the $14 million of rare coins, but failed to turn over 102 gold bars, 699 gold bullion coins, the bust of Julius Caesar and·the remaining gold coins. At the resumed hearing on January 14, 2000, the receiver called several witnesses and while Armstrong called no witnesses, he chose to testify personally. It is to be noted that at that point Armstrong was aware through the Court's observation a week earlier that the Court was .acting under the authority of *Braswell v. United States,* 487 U.S. 99, 108 S.Ct. 2284, 101 L.Ed.2d 98 (1988), and that he as a corporate officer had no right to decline to produce any of the items, and that the *Braswell* case had an evidential privilege protecting his act of production from being used against him.[4] The transcript reads:

> THE COURT: Were you about to address the court?
>
> MR. FELD [Armstrong's counsel]: Yes, your Honor. Last Friday, January 7, your Honor directed Mr. Armstrong to turn over all the corporate assets in his possession and all of the corporate

---

**3.** At the time of the service of the subpoena, Armstrong was Princeton's Chairman, officer and director, as stated, and there is no evidence he ever resigned before and after the subpoena. Indeed he continued inappropriately to exercise these powers in the Turks and Caicos Islands to try to undermine this Court's jurisdiction. While Armstrong denies contemporaneous knowledge of the receiver's written agreement (the MOA, *see* petition p. 7, fn. 3) to deal with this dated October 7, 1999 and filed with the Court's stamp, October 15, 1999, his lawyer has never denied getting it at that time, *see* 197 F.Supp.2d at 117.

**4.** This is probably the first of a dozen times over the following years that Armstrong was advised that he had no right to interpose a Fifth Amendment privilege against production under *Braswell*—"just put it on the receiver's door-step"—which, however, he continues to claim ever since January 14, 2000. Armstrong has also since that time continuously contended that *the Court had ordered him* to give testimony (giving rise to his oft repeated Fifth Amendment assertion). However, the transcript of January 14, 2000 at p. 99 above completely undercuts this reading. While Armstrong quotes the Court's language as follows to support this claim:

> [I]f there is nonproduction, I'm going to want a competent explanation. I don't want a Fifth Amendment explanation. I don't want a rank hearsay explanation.

He omits, however, the critical continuation of the Court's language:

> I want something where even the lawyers, if necessary, say "we went here and we went there and we looked at this and we did that," and then you swear to it. So if there is nonproduction on any item, I want an explanation of how come no production.

Thus, the District Court did not compel him to testify. Rather, it was simply stating that neither the assertion of a Fifth Amendment right nor hearsay would suffice to meet petitioner's responsive burden. *United States v. Rylander,* 460 U.S. 752, 757, 103 S.Ct. 1548, 75 L.Ed.2d 521 (1983).

records and documents in his possession.

Your Honor ruled that he was a custodian of records and that pursuant to the *Braswell* decision he had no right to decline to produce that and to comply with that order and that the *Braswell* evidential privilege protected his act of production.

This record on whether Mr. Armstrong has to the best of his ability within the time allotted him complied to your Honor's order can only be demonstrated if we hear Mr. Armstrong's testimony on what he did to comply. *I would offer his testimony limited to the issues of compliance* with your Honor's ----

THE COURT: Let's go.

Mr. FELD: *I call Mr. Armstrong to the stand.*

(emphasis supplied).

With regard to the missing rare coins and the bust of Julius Caesar,[5] Armstrong without any support other than his testimony stated that he transferred most of them to an Australian business associate, Nigel Kirwan, in September 1998, in a business transaction.[6] Armstrong also acknowledged that as to the missing 102 gold bars, he said he took them home and "slid them underneath the three cushion sofa that was there in the living room [in New Jersey]." He testified that several months later he gave them to a Japanese business associate, Akira Setogawa, as part of a settlement for his interest in his in a joint business venture. According to Armstrong, Setogawa came to see him in a limousine and "the transfer was made in the parking lot, from the trunk of my car to the limousine." With respect to the 699 gold bullion coins, Armstrong testified that he gave away some "for gifts and bonuses to employees around the world" and some gifts to Japanese visitors. The Court of Appeals later noted in 2001, 269 F.3d 109, 112:

> Armstrong claimed at the July 6 hearing that he lacked the ability to produce the items that he had been ordered to produce. The District Court rejected the claim, ruling that this contention was inadequately supported. *See Huber v. Marine Midland Bank,* 51 F.3d 5, 10 (2d Cir.1995) ("burden of proving *plainly and unmistakably* that compliance is *impossible* rests with the contemnor") (citations and internal quotation marks omitted).

(emphasis in original). And a year later, a similar observation was made by another Court of Appeals panel, *see Commodity Futures Trading Com'n v. Armstrong,* 284 F.3d 404, 406:

> Armstrong had the burden of producing evidence to show that he cannot comply with the order. The district court observed that Armstrong has come forward with none. On appeal, Armstrong does not challenge that finding (or cite any new evidence). Rather, he argues that the length of his confinement (now more than two years), combined with his repeated declarations that he will not comply with the contempt order, compel the conclusion that, in fact, he will never comply, and thus that the order has lost its coercive effect. He also

---

5. As to coins turned over to the receiver, Armstrong claims he had kept them "hidden in a shed in the backyard." As to a computer he turned over, he had stripped it of its hard drive.

6. The receiver thereafter submitted evidence that Armstrong purchased more than $2.3 million of the coins *after* the September 1998 alleged turnover transaction to Kirwan.

argues that in light of his extended incarceration and the fact that law enforcement authorities have searched his home and offices and found none of the subject assets, the district court could not reasonably have found that the assets remain in Armstrong's possession or control.

Both arguments are meritless. True, Armstrong has been confined for more than two years, but the length of his confinement must be viewed in the light of the value of the concealed property, which is unusually great. Furthermore, we agree with the district court that the coercive effect of Armstrong's incarceration has likely been attenuated somewhat by the pendency of his various appeals and petitions for extraordinary relief. Significantly, while the coercive effect of the initial contempt order decreased as the expiration date drew near, the July 6, 2001 order contains no expiration date. With the dismissal of the instant appeal, Armstrong will for the first time be faced with the prospect of indefinite confinement.

Having found that the receiver had established by the clear and convincing evidence that the gold bullion, the coins and the Julius Caesar bust remained in Armstrong's possession, custody or control and he refused to turn them over, Armstrong was ordered remanded in civil custody to the Metropolitan Correctional Center on January 14, 2000 to endeavor to compel the production, and the U.S. Marshals immediately carried that order into effect. Armstrong appealed and the Court of Appeals directed this Court to issue a clarifying order providing further details of findings and conclusions of law which this Court did in August 2000. Since then, Armstrong has pursued many interlocutory appeals from that confinement, including a number that went to full appellate briefing and argument. In these Armstrong repeatedly justified his noncompliance asserting a Fifth Amendment privilege not withstanding this Court's repeated instruction to him that *Braswell* provided protection against the use against him of an act of production, *see supra,* and in his second and third appeals, each brought after 18 months of incarceration he asserts the 18 months limitation in the Recalcitrant Witness Statute, 28 U.S.C. § 1826, usually pertaining to grand jury proceedings, notwithstanding the inapplicability of the section, *see* 152 F.Supp.2d at 458 n. 2, and in any event, the term of incarceration had been made indefinite with the Court of Appeals' full awareness of this by two panels, *see* 269 F.3d at 112 and 284 F.2d at 406.[7]

Since that time, Armstrong has been brought over from the Metropolitan Correctional Center with some frequency to enable him to address the Court with regard to compliance and ability to comply with the contempt order.

Among those many times, on June 3, 2004, the transcript relevantly reads:

> Mr. Armstrong, you have now sent to me for the Circuit an affirmance of your continuing detention here, dated 26 February 2004, for Judges Walker, Calabresi and Cabranes, which, among other things, they observe that you do not challenge the district court's finding or cite to any new evidence that would suggest to the district court that you could not comply with the turnover order. That is a quote. And they affirmed the discretion of this court to continue to trust that at some point the

---

7. Armstrong erroneously asserts the applicability of 18 U.S.C. § 4001(a) which, however, is addressed to the executive branch and a different problem.

$15 million of materials would be turned over. This is against a Court of Appeals review of March 18th of 2002.

I have gone back through about seven or eight transcripts looking at what you have been telling me. January 7th of 2002, at that point stating to me that, quote, I spent two years in prison supposedly because I am the director of the institute. February 22nd, among other things, you say, page 51, you have never been given an inventory of what was to be produced, among a number of other things.[8] June 19 is the Mexican standoff quote on your part. Quote, you [referring to the Court] will not change your opinion on my Fifth Amendment and I cannot comply, so I will have to go to trial and at that point we will have to deal with the real issues. September 23rd is the interesting day where we got on the record finally through Mr. Cooper [one of his many lawyers] acknowledging that in the Fifth Amendment context you did in fact say that you do not have to turn over anything. November 7th of 2003, you reiterate again, I have never received an inventory of what was produced or what is claimed to be missing. I don't know what I have to turn over, page 39. When you were asked about are you going to turn anything over, at the prior time you had said that you just don't want to. You said, well, my position is, quote, I haven't made a decision. December 15, 2003, you took the position you didn't have to turn it over because, quote, I don't believe it is constitutional, page 41. ... February 23rd of 2004, when I made the observation on which [when?] we would see $15 million worth of coins in [and?] gold bars, your answer to me

was, perhaps if we go to trial and I can prove my innocence, we might find something very important as to who is actually covering up for whom in this district.

Now, I have gone through all of this ... because you have now been in going on four years, right?

MR. ARMSTRONG: Four and a half years.

THE COURT: As a United States district judge, I find it just incredibly distressing that with all of that review and with the Second Circuit's review and their observations and my observations and your various positions, I don't have to, I don't want to, I have no need to do it, I have the Fifth Amendment of the Constitution—let's put is this way. It bothered me, as one of my children once said, that the United States District Court can, in my opinion, be played with as you have done with us in this period of time. It seems to me perfectly clear that you do have the power to turn over this material, which is not inconsequential, as the Court of Appeals has said, and, yes, a lot of time has passed, and, yes, it is a lot of money, and I do feel it is there to be gotten and that you are engaged in your, quote, Mexican standoff with us. I am continuing to stand.

Now, I observe to you again the opportunity is here to comply with this. As you know, and we all know in this room, Mr. Kirwan has no real record, whatever you gave him, anything, Mr. Setogawa, you say you put a million dollars of gold bars in the trunk of his rented limousine and he drove off in New Jersey, with not one single scrap of paper you gave him any of that. So the Court of Appeals has, in my view, ob-

---

8. [Footnote by the Court] The Court of Appeals had earlier requested and was given an inventory, copy to Armstrong, *see* p. 6 *supra*.

served with the same sense of astonished skepticism that you continue to maintain that these are defenses to a perfectly obvious turnover.

At this point I felt it was appropriate to bring you over since the Court of Appeals sent me most recently, which was given to me on the 7th of May saying we deny the appeal, to give you another opportunity so that nobody can contend that you are not being given every chance to comply. So I put to you again, are you going to or are you not going to?

MR. ARMSTRONG: Your Honor, I think that the opinion of the Court of Appeals, your Honor, throughout this case has always declined to accept jurisdiction. They have never reached the merits of anything, and in this last order they directed that a habeas corpus be filed to create a record for them to review. Now Mr. Sjoblom's firm, Chadbourne & Parke, is in the process of doing that.

Three months later, September 23, 2004, I had Armstrong back before me. At that time, the brief hearing went as follows:

THE COURT: There has never been a statement to this Court or them or anybody else that you could not comply; it just was that you wouldn't comply. That is really where we are at.

You have brought a habeas petition through counsel, and I will get to that, I suppose, in a little bit here. I take it your position, as far as a production of things under the contempt order, your position is exactly the same as before, which is not that you can't but that you don't have to and you don't want to. That is really where I continue to see you are at.

MR. ARMSTRONG: Your Honor, I cannot find any case post indictment where anybody -

THE COURT: I am not looking for any cases. I am looking for your state of mind. Does that continue to be your state of mind?

MR. ARMSTRONG: My state of mind is that I stand upon my constitutional rights.

THE COURT: OK.

I note that in the interim, the Court of Appeals has twice observed, quoted *supra*, that Armstrong does not challenge the finding that he has the ability to turn over the assets.[9]

Accordingly, Armstrong's contention under the § 1826 limit being meritless and inapplicable as the Court of Appeals observed years ago, and the Fifth Amendment claim being no bar to production under *Braswell* because a *Braswell* turnover does not require testimony, and no use can be made of the fact of a simple turnover of corporate assets by a corporate officer, and Armstrong has known this since September 1999, this is no basis for refusing to produce.[10]

---

9. I also note that the Court of Appeals some two years ago made the observation that the coercive effect of Armstrong's incarceration perhaps had been attenuated somewhat by the pendency of his various applications and petitions for extraordinary relief and with that Court's conjecture that these appeals coming to the end he might at last see the light and comply. The pendency of the appeals and petitions, however, has not let up since.

10. Armstrong's contention that a District Court lacks the power to imprison or detain absent a specific "Act of Congress" led in the course of the argument before the Court on January 3, 2004, to the following illuminating exchange. Tr. p. 35.

THE COURT: [To Armstrong's attorney Mr. Sjoblom] Let's take an absolutely hypothetical case where you have a defendant in front of you, and you happen to have a United States Marshal sitting out in the

The final claim in Armstrong's habeas petition is that the U.S. Attorney's Office has used the SEC's civil action to violate his due process rights in the parallel criminal case pending before Judge McKenna, and that the District Court's continuing incarceration of Armstrong is allowing the government to manipulate the civil enforcement proceeding to gain advantage in the criminal proceeding.[11] This occasioned me to request and obtain from the U.S. Attorney's Office a Memorandum of Law addressing this. That memorandum recites a number of very material facts destroying Armstrong's contentions and particularly his failure over four years to prepare for his criminal trial. The memorandum points out that in addition to those submissions mentioned earlier, he has made dozens of *pro se* submissions on the criminal side to District Court Judge McKenna regarding such things as: assignment of counsel of his choosing; a modification of conditions of confinement at the Metropolitan Correctional Center; and an order vacating the civil contempt imposed by this Court.[12] But Armstrong has not made any submission on the merits in the criminal case and has only superficially contended he did not have access to discovery. It appears that Armstrong has been given approximately 175 of boxes of discovery, 73 compact discs, virtually unlimited computer access to review and has had three lawyers assigned pursuant to the Criminal Justice Act by Judge McKenna. Armstrong has had a fourth lawyer with regard to the contempt. In May 23, 2003, three and a half years after the

back. And the next thing you know, that defendant is doing a hundred-yard dash for that door. Okay? Do you mean that I need an act of Congress to scream out, "Marshal, grab him"?
MR. SJOBLOM: I think you do. I think the judicial-
THE COURT: Oh, please. Come on.

indictment, the government stated before Judge McKenna at page 26:

> [ ]Mr. Armstrong is simply upset with the fact that he's been confined on civil contempt. He may or may not have a valid argument. We don't believe they're valid, but they just don't belong here, your Honor, and your Honor has said so on many occasions. And we keep wasting hours and hours and months and months in this proceeding hashing over issues that would have already been litigated or should be properly litigated before Judge Owen. And at some point today, your Honor, if there is an opportunity, I would like to make a proposal about pushing this case along.

Defense counsel responded that "[t]hat's just a waste of time to bother with that at this point."

With regard to Armstrong's claim that he has not had access to discovery, the government stated:

> [W]ith regard to Mr. Armstrong's continued request to access the discovery, we have produced for some time many boxes assuredly. I do recall, two and a half years ago there was a proposal or the MCC was permitting Mr. Armstrong to have four to six boxes in his cell at any one time. If Mr. Armstrong can spend a 10th of the time he has spent with all of these pro se submissions actually reviewing the boxes in the last two and a half years, he would have been through the discovery three times by now.

11. This argument was withdrawn at the hearing on this petition, *see* tr. at 83.

12. One of these occasioned the Court of Appeals to write in a Summary Order of February 15, 2001, "... petitioner [Armstrong] is warned that the filing of future frivolous mandamus petitions may result in sanctions."

When Judge McKenna tried to set a April 2004 trial date, Armstrong's counsel replied that date was not realistic "because Mr. Armstrong really has not even commenced to review the materials." Armstrong, along with his counsel, claimed he would not be able to review discovery and prepare for trial until he received his own personal laptop computer in prison. The Government noted that:

[T]he record should be clear on this point, and that is that I think that perhaps the most telling thing [defense counsel] said ... was that Armstrong in this case, the criminal case, has reviewed virtually nothing. He has been in jail for 4 years. He has reviewed nothing. We went through a great deal of effort to copy everything ... onto paper. We produced the paper for the very reasons that it was contemplated, lo almost 3 years ago, that Mr. Armstrong would review the materials and we arranged for a larger number of boxes to be made available to him ... When it comes to the computer, and this I understand from [the MCC's letter to the Court] that to their knowledge Mr. Armstrong has never availed himself of the computer that is available to him on the floor [at the MCC] ... the ball has not been rolling in the discovery in this case because Mr. Armstrong has refused to take advantage of the efforts that have been made by the government to make available to him discovery. He is just simply not looking at it.

A staff attorney with the MCC, Les Owens, explained to Judge McKenna the computer facilities available to Armstrong:

[W]e ha[ve] taken measures of providing a computer on every housing unit for inmates to review CD–ROMs, added on to the law library, two there, another in the special segregated housing unit.

They are grossly underutilized. They are not used a lot. This is not the situation where there are lines to use the computers. Mr. Armstrong was taken to one of these computers along with Ms. Jackson [an MCC employee]. His unit manager, my colleague in the office [of legal counsel] Mr. Johnson, where they physically plugged in the CD–ROM, verified they do work on the computer provided on the housing unit. There was possibly one CD there was some problem bringing it up ... To my knowledge Mr. Armstrong has never used the computer. He has not filed a single administrative remedy regarding issues. If there are issues with him, if something is not working properly, your Honor, I submit in the first instance we can rectify it. It has not ... Mr. Armstrong has been given ample time in the law library. He is down there more than any inmate I am aware of. He has a computer on his housing unit, rarely if ever, I don't believe it's been used by other inmates, available at his disposal for the better part of 8, 20, 10 hours a day. He has never requested additional time either on that computer ... It is MCC's position, your Honor, that they have provided Mr. Armstrong adequate access to a computer for review of these discovery materials. He has brought no problems to our attention with respect to the use of those computers.

I note that Armstrong contends that the area where the computer is located is too noisy and the computer does not have the appropriate software. Two further observations end the discussion in this area: (1) Armstrong provided no rebuttal submission either on the civil or criminal side, notwithstanding one of my clerks spoke with his attorney whether he wished to provide such and was told he did not; and (2) during the course of the argument hereof before me when it got down to

discussion on the criminal side of the matter, Mr. Cooper, Armstrong's criminal attorney in the Court spoke out of the blue stating: "Your Honor. Mr. Armstrong has indicated to me that he has authorized me to indicate to the Court that he is prepared to drop this argument entirely." When pressed to be specific, Cooper specifically designated the withdrawn argument being argument no. 3 the Manipulation of Civil Case (stated at p. 72 of the petition as: "The District Court's Continuing Incarceration Of Armstrong Is Allowing The Government To Manipulate The Civil Enforcement Proceeding To Gain An Advantage In The Criminal Proceeding").[13]

Given all the foregoing, with regard to the inapplicability of § 1826 and Fifth Amendment rights, these positions are rejected on the law and with regard to the criminal case, after withdrawal of Point No. 3 at p. 72, *supra,* which was at best only conclusorily supported, there is nothing with regard to the criminal case that requires attention of the Court on this motion, particularly given the observation earlier that there were no reply papers by Armstrong disputing either of the opposition memoranda. Accordingly, Armstrong's Petition for a Writ of Habeas Corpus dated August 23, 2004 is denied in its entirety on the undisputed facts and the law.

So ordered.

---

**13.** This withdrawn argument is the same one Armstrong made at pp. 2–3 and 9–10 of the instant petition.